Filed 1/28/16  P. v. Vue CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHU VUE,<br><br>　　　　　Defendant and Appellant. | C066885<br><br>(Super. Ct. No. 09F02572) |
| THE PEOPLE,<br><br>　　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>GARY VUE et al.,<br><br>　　　　　Defendants and Appellants. | C069517<br><br>(Super. Ct. No. 09F02572) |

Chu Vue engaged the services of his brothers, Chong and Gary Vue, to murder his wife's lover, Steve Lo.[1]  Chu and Lo were both correctional officers.  Chong and Gary

---

[1]　Because the defendants in this case have the same last name, we refer to them by their first names.  We do the same with respect to others who also share their last name.

1

were wanted in connection with a 2001 Minnesota murder and had spent the better part of a year living in a mobile home Chu moved onto on a rural property to keep them hidden. During the month leading up to Lo's murder, Chong and Gary also stayed in various motel rooms rented for them by Lang Vue, a member of the same Hmong clan and a family friend, who also rented a number of vehicles used by Chu and his brothers to conduct surveillance on Lo's house.[2] The morning of the murder, as Lo opened his garage door to leave for work, Chong and Gary entered the garage and shot him to death.

Chong and Gary were tried together, before separate juries. Chu was tried separately from his brothers. Each was convicted of first degree murder (Pen. Code, § 187, subd. (a))[3] with a lying in wait special circumstance allegation found to be true (§ 190.2, subd. (a)(15)). Gary's jury found he personally and intentionally discharged a firearm during the commission of the murder; Chong's jury found this allegation to be not true. (§ 12022.53, subd. (c).) Chu's jury found a principal in the murder was armed with a firearm. (§ 12022, subd. (a)(1).) In addition to the murder, Chu was convicted of harboring a principal in a felony (§ 32), i.e., his fugitive brothers, and unauthorized access to a computer system (§ 502, subd. (c)(1)). The latter was based on Chu's use of the sheriff's department computer system to obtain information about Lo. The trial court sentenced each defendant to serve a term of life imprisonment without the possibility of parole (LWOP). In addition to this LWOP sentence, Chu was sentenced to serve a determinate term of 4 years 8 months and Gary was sentenced to serve a determinate term of 20 years.

---

**2** Lang was also charged with Lo's murder and harboring a principal in a felony. He was tried with Chu, acquitted of the murder, and found guilty of the harboring charge. He does not appeal.

**3** Undesignated statutory references are to the Penal Code.

2

In case No. C069617, Chong and Gary contend the trial court prejudicially erred and violated their constitutional right to a fair trial by (1) admitting evidence of the Minnesota murder, (2) instructing the jury with CALCRIM No. 362 on consciousness of guilt, (3) instructing the jury with CALCRIM Nos. 416 through 420 on vicarious criminal liability based on conspiracy, and (4) instructing the jury, pursuant to CALCRIM No. 316, that it "may consider" a finding that a witness has engaged in prior criminal conduct in assessing that witness's credibility, rather than instructing the jury it "must consider" such a finding. Chong and Gary also claim (5) the cumulative effect of the foregoing assertions of error requires reversal. In case No. C066885, Chu claims (6) the trial court prejudicially erred and violated his constitutional rights by ordering him restrained in belly chains through most of the trial and requiring him to be chained to the witness stand while testifying without a showing of manifest necessity for such restraint.

Having consolidated the appeals for purposes of argument and disposition, we affirm the judgments. As we explain, evidence Chong and Gary were wanted in connection with a 2001 Minnesota murder, which was publicized during prime time television viewing hours in California in 2006, as well as the fact Chu went to great lengths to hide them from those seeking to effect their arrest, was properly admitted under Evidence Code section 1101, subdivision (b), as relevant to prove motive on the part of Chong and Gary to participate in the plot to murder the man who was having an affair with Chu's wife and to actually carry out the murder on Chu's behalf. This evidence was not unduly prejudicial under Evidence Code section 352. Nor did the admission of this evidence violate their constitutional right to a fair trial. The various claims of instructional error raised by Chong and Gary also fail. CALCRIM No. 362 on consciousness of guilt was adequately supported by the evidence, at least with respect to Chong; with respect to Gary, the contention is forfeited by his failure to object to the instruction in the trial court. CALCRIM Nos. 416 through 420 accurately state the law regarding vicarious criminal liability based on conspiracy. That such liability attaches to

3

those who join together in a conspiracy to commit a crime has been the law in this state for more than a century. CALCRIM No. 316 is also an accurate statement of the law, as we have previously held. Having rejected each contention raised by Chong and Gary in their appeal, we must also reject their claim of cumulative prejudice. Finally, with respect to the sole contention raised in Chu's appeal, we conclude any error in requiring Chu to be restrained during trial, including while on the witness stand, did not violate his federal constitutional rights and was harmless under the standard of prejudice applicable to state law error, i.e., there is no reasonable probability the result would have been different had Chu not been so restrained.

## FACTS

Because Chong and Gary assert the majority of claims raised in these consolidated appeals, we recite the facts based on the record in their joint trial, noting any relevant differences in the evidence heard by their respective juries. We do so in the light most favorable to the judgments of conviction. Relevant differences in the evidence presented at Chu's trial will be addressed in the discussion portion of this opinion, when we discuss Chu's sole contention of error.

### *Chu's Motive for the Murder*

Chu and Chia married in a traditional Hmong ceremony in 1987. In 2008, Chu worked for the Sacramento County Sheriff's Department as a correctional officer at the Rio Cosumnes Correctional Center (RCCC). Chia worked as a medical assistant at the California Medical Facility (CMF), a correctional institution run by the Department of Corrections and Rehabilitation.

In the summer of 2008, Chu began to suspect Chia of adultery. His suspicions were based on an unfamiliar phone number that repeatedly appeared on the phone bill. He was right about the affair. For the previous year, Chia had been involved intimately with Steve Lo, a correctional officer who worked with her at CMF. When Chu confronted Chia with his suspicions at the end of July, she admitted the affair, but did not reveal her lover's identity. She did, however, acknowledge his name began with an "S"

4

when Chu pressed her for a name and asked who was entered in her cell phone contacts list as "SOLO."  About a week later, Chu also found pictures on Chia's cell phone of her and Lo having sex.[4]

The following month, Chu employed various means to learn the identity of his wife's lover, some of which were lawful.  For instance, Chu used an online record gathering resource to do reverse phone number searches.  He also asked one of Chia's co-workers for the names of Hmong employees working at CMF, who revealed three potential last names:  Xiong, Lo, and Yang.  Other methods were unlawful.  For example, after apparently seeing Chia and Lo together in the 24-Hour Fitness parking lot, a place they occasionally met, Chu called a friend who also worked for the sheriff's department and asked him to run a search of a license plate number through the department's computer system, claiming the driver of the vehicle with that license plate tried to "run him over" in the parking lot.  The deputy informed Chu the owner of the vehicle associated with that license plate was "Steve Lo."  Chu also asked his supervisor at RCCC for permission to use the sheriff's department computer record system to search for "someone."  The supervisor did not ask whom Chu wanted to check using the system, but explained it would be illegal to do so unless there was a valid law enforcement purpose and advised Chu not to do "anything stupid."  Notwithstanding this warning, Chu used sheriff's department computers on at least five occasions to search for "Steve Lo" and other variations of Lo's name, including "Xay," which was Lo's middle name.  The search results for "Xay Lo" revealed Lo's address in Elk Grove.

Chia filed for divorce in September 2008.  Lo was murdered at his home the following month.  When Chu first learned his wife was having an affair, he was "depressed" and "angry about the situation."  He also lost weight, "[a]t least ten pounds."  However, closer to the time of the murder, his attitude changed, "he wasn't mad

---

[4]     Chu was also having an affair with another woman, Mary Cha.

5

anymore." On the subject of the affair, Chu told a friend at the sheriff's department: "People who do bad things eventually karma catches up with them."

### *Chong and Gary's Motive for Participating in the Murder*

In 2001, Chong and Gary were involved in a drive-by shooting in Minnesota. Chong was the driver; Gary, seated in the passenger seat, fired multiple shots into the driver's side of another vehicle, killing the driver of that vehicle.[5]

In 2004, Gary moved to California. He stayed at various places, including a house in Sacramento owned by his brother, Chu. In March 2006, law enforcement officers from Minnesota executed a search warrant at this house with the assistance of the Sacramento County Sheriff's Department. Gary was home at the time and agreed to accompany a detective to the station, where he was questioned about the 2001 drive-by shooting and admitted being the shooter. After the interview, Gary was returned to the house. Chu was there when Gary was returned. The detective told Chu to inform the sheriff's department if Gary left the house. Chu did not do so. When deputies came back less than an hour later, Gary was gone.[6] The following day, warrants were issued by the State of Minnesota for the arrest of Gary and Chong. The same month, Chong learned he was wanted for the 2001 murder and left Minnesota for California. Chong's wife, Neng, after speaking to Chu on the phone, facilitated Chong's escape from Minnesota by taking

---

[5]     The separate juries heard this information from different witnesses. Both juries heard testimony from the patrol officer who responded to the scene of the drive-by shooting. Gary's jury learned about his role as the shooter and Chong's role as the driver from Gary's videotaped confession. Chong's jury learned about their respective roles from Chong's statement to his former wife, Neng Vang.

[6]     As mentioned, only Gary's jury heard his confession. Chong's jury received a stipulation that the house was searched, law enforcement made contact with Gary during the search, Gary was interviewed and returned to the house, Chu was present when Gary returned and was told to notify the sheriff's department if Gary should leave. Gary then left without Chu informing the department.

her brother's car and giving it to Chong, along with a prepaid cell phone and about $900 in cash.

In January 2007, Chu began looking for a rural property to use as a hideout for his fugitive brothers. Two months earlier, Gary and Chong were mentioned in an episode of the Fox Television network program "*America's Most Wanted*," season 20, episode 5, that was broadcast November 4, 2006, during prime time viewing hours in California and Minnesota. (http://www.tv.com/shows/americas-most-wanted/november-4-2006-944154/, retrieved Jan. 27, 2016.) A picture of Gary was displayed while the episode's narrator stated: "Cops in Minnesota say Gary Vue murdered a man. Gary Vue may be hiding with his brother Chong." Chu began the search for the hideout location by calling a real estate agent in Tehama County. He identified himself as John Vue and said he worked for the Sacramento County Sheriff's Department. After viewing two or three properties, Chu settled on a piece of land on Troutbrook Road in Corning. He first said he wanted the property for himself, but then said he was buying the property for a family member.

Chu purchased the Corning property on behalf of Khou Vue, obtaining a loan in her name to finance the purchase in April 2007. Khou was not related to Chu, but shares his last name due to their common Hmong clan. As Khou explained the transaction, Chu told her he wanted to buy the property for "business," although he did not explain what that business was, and said he would take care of the money and the paperwork if she agreed to have the property title in her name. She agreed because Chu was "very well respected" in the Hmong community, their families were "from the same clan and . . . know each other very well," and clan members are "supposed to help each other." After buying the property, Chu also bought a mobile home and hired various contractors to grade the property, move and set up the mobile home, drill a well, and put in a septic system and utilities. Chu also spoke to the Tehama County building inspector on three occasions during the spring or early summer of 2007. During these conversations, Chu

7

used his actual name and told the inspector "he used to be a deputy sheriff." He also said the property belonged to "his sister," for whom he was "fixing it up."

Thereafter, Chong and Gary began living in the mobile home on the Corning property. Their respective significant others visited them there in November 2007 to celebrate Thanksgiving. Chong's wife also visited him at the mobile home on two or three additional occasions in 2008; Gary was present each time she was there. Their sister, Allyssa, visited the property in September 2008. While Chong and Gary were not there at the time, Allyssa suspected they were staying in the mobile home because of the presence of men's clothes she believed belonged to her brothers and the smell of the cologne they wore. Allyssa also dropped off food at the mobile home at Chu's request.

### The Planning Phase

During the month leading up to Lo's murder, Chu and his fugitive brothers conducted surveillance on Lo's residence, using various rented vehicles, and one purchased using a false name, to drive past Lo's house. They communicated using prepaid cell phones during their operations. Somewhat ironically, a surveillance camera used by one of Lo's neighbors captured their efforts on video. Because Chong's jury received no direct evidence that Chu engaged him and Gary to kill Lo on his behalf, we provide a fairly detailed account of the circumstantial evidence connecting each brother to these surveillance activities.[7]

On September 16, 2008, four days after Chia filed for divorce, Chu took a cash advance from one of his credit cards in the amount of $4,000 that he deposited into his checking account. The same day, he withdrew $3,500 in cash from that account. Later in the day, a green pickup truck was caught on surveillance video driving past Lo's house.

---

[7] Gary confessed to having murdered Lo with his brother Chong at Chu's request. He confessed to his girlfriend, Kalue Vang, who related his confession to his jury, which we describe in greater detail at the end of our factual recitation.

8

While the video footage was not clear enough to make a definitive identification, the truck on the video appeared to match Chu's green pickup.

On September 19, Lang Vue rented a room at the Ramada Inn near Richards Boulevard in Sacramento. (Like Khou, Lang shares defendants' last name due to their membership in the same Hmong clan. Lang was also one of Gary's friends.) The occupants of the room stayed for two nights. That the room was rented for Chong and Gary at Chu's direction is supported by the following. Lang and Chu spoke on the phone using their registered cell phones the same day Lang rented the room. The room was paid for with cash at a time Lang was not doing well financially. Chu, however, withdrew a large sum of money from his checking account three days earlier. The day the room was rented, a prepaid cell phone being used by Chong and Gary also connected to a prepaid cell phone being used by Chu, who was at work at the time.[8] During the call, Chu's phone's signal was transmitted by (pinged) a cell tower close to RCCC while the phone being used by Chong and Gary pinged a cell tower close to the Ramada Inn. Prior to this date, that phone pinged cell towers in the Corning area, where their hideout was located. The following morning, when Chu got off work, he again used his prepaid phone to call Chong and Gary, and again Chu's phone pinged the cell tower close to RCCC while the phone being used by Chong and Gary pinged the cell tower close to the Ramada Inn. However, about half an hour later, there was another call between these

---

[8]     An analysis of various cell phone records indicated Chong and Gary were using a prepaid cell phone with a number ending in 2743 until October 7, 2008, at which point they began using a prepaid cell phone with a number ending in 6821. These records also indicated Chu was using a prepaid cell phone with a number ending in 4429, as well as a cell phone registered to his sister, Allyssa, with a number ending in 8972. He used this latter phone primarily to call his girlfriend, Cha. Chong and Gary also used separate prepaid cell phones, with numbers ending in 7295 and 1542, respectively, which they used primarily to speak with their significant others. Lang used three prepaid cell phones, with numbers ending in 4276, 2147, and 0429.

phones, during which both phones pinged the cell tower close to the Ramada Inn, indicating Chu had driven there after his work shift.

On September 21, the day Chong and Gary checked out of the Ramada Inn, Lang rented a room at the Motel 6 off of Stockton Boulevard in south Sacramento. The room was rented for four nights and was again paid with cash. The first night, a vehicle similar to Chu's green pickup was caught on surveillance video driving past Lo's house. As the truck drove past the house, Chu used his prepaid cell phone to call Chong and Gary. Chu's phone pinged the cell tower close to Lo's house and the phone being used by Chong and Gary pinged the cell tower close to the Motel 6.

Later that night, after Chu went to work, Lang rented a dark blue Ford Explorer from Avis. At the time the Explorer was being picked up, Chu used his prepaid cell phone to call Chong and Gary. Chu's phone pinged the cell tower close to RCCC. The phone being used by Chong and Gary pinged the cell tower close to the Avis rental location. Chu called Chong and Gary twice more that night, at roughly one-hour intervals. During the second of these calls, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. About four minutes after this second call was made, an SUV similar to the rented Explorer drove past Lo's house. About half an hour later, shortly after midnight on September 22, an SUV similar to the rented Explorer again drove past Lo's house. Four minutes after that, the phone being used by Chong and Gary again pinged the cell tower near Lo's house. Later in the morning, this phone was again pinging the cell tower close to the Motel 6 where Lang rented the room. That afternoon, Chu again used his prepaid cell phone to call Chong and Gary. The phone being used by Chong and Gary pinged the cell tower close to Lo's house. Five minutes later, an SUV similar to the rented Explorer drove past Lo's house. Later that night, the surveillance video captured a similar SUV driving past Lo's house six times. During one of these occasions, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. Just before midnight, that phone was again pinging the cell tower close to the Motel 6.

10

On September 23, Chu took an $8,000 advance from one of his credit cards and deposited that amount into his checking account. The following day, a truck similar to Chu's green pickup drove past Lo's house three times in less than a two-hour period. During this same period of time, within one minute of two of the drive-bys, Chu used his prepaid cell phone to call Chong and Gary. Chu's phone pinged the cell tower close to Lo's house. The phone being used by Chong and Gary pinged the cell tower close to the Motel 6. During the third drive-by, the surveillance video shows the driver of the truck wearing what appears to be a black short-sleeved shirt. About two hours later, Chu entered his bank wearing a black short-sleeved shirt. At the bank, Chu closed his checking account, withdrawing $10,675.96 in the form of a cashier's check. About an hour later, Chu opened a checking account at a different bank, depositing $10,090.96 into that account, renting a safety deposit box for $85, and depositing the remaining $500 into a separate account.

On September 25, the day Chong and Gary checked out of the Motel 6 in south Sacramento, Lang rented a room at a different Motel 6, near the Ramada Inn where they had previously stayed. The room was rented for two nights and paid with cash. Also on this date, around noon, Lang returned the Explorer to Avis and exchanged it for a silver Chevy TrailBlazer. About three hours later, an SUV similar to this rented TrailBlazer drove past Lo's house. Six minutes after that, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. About half an hour later, an SUV similar to the rented TrailBlazer again drove past Lo's house. Less than an hour and a half after that, the phone being used by Chong and Gary again pinged the cell tower close to Lo's house. Later that night, an SUV similar to the rented TrailBlazer drove past Lo's house five more times.

The following morning, September 26, an SUV similar to the rented TrailBlazer again drove past Lo's house. That night, Lang returned the silver TrailBlazer to Avis and exchanged it for a blue TrailBlazer. Around this time, Chu used his prepaid cell phone to call Chong and Gary. The phone being used by Chong and Gary pinged the cell tower

11

close to the Avis rental location. About an hour later, an SUV similar to the newly-rented TrailBlazer drove past Lo's house. Later that night, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. Chong and Gary checked out of the Motel 6 the following day. The day after that, an SUV similar to the rented blue TrailBlazer drove past Lo's house three more times. By the early morning hours of September 29, the phone being used by Chong and Gary was again pinging cell towers close to their hideout in Corning. Lang returned the blue TrailBlazer to Avis later in the day.

On October 2, Allyssa rented a room at the Motel 6 off of Richards Boulevard. She did so because Chu called and asked her to rent the room for Chong and Gary. When she arrived at the motel, Chong and Gary were waiting for her in the parking lot. They each had a backpack. The following day, Lang rented another SUV from a different Avis rental location. Initially given a red Chevy Traverse with Texas license plates, he returned a few minutes later and exchanged this vehicle for a gray Dodge Nitro with California plates. When Lang returned to exchange the vehicle, he had two individuals with him. Chong and Gary checked out of the Motel 6 on October 4. That morning, their prepaid cell phone pinged the cell tower close to the Motel 6 three times. Later in the afternoon, it twice pinged the cell tower close to Lo's house. The following night, their cell phone again pinged a cell tower in the Corning area. During the early morning hours of October 6, a truck similar to Chu's green pickup drove past Lo's house. Three minutes later, Chu's registered cell phone pinged the cell tower close to Lo's house. About two hours after that, an SUV similar to the rented Nitro drove past Lo's house. Later in the morning, Chu withdrew $3,000 from his checking account. That afternoon, Lang returned the Nitro to Avis. About an hour and a half after the Nitro was returned, Chu used his prepaid cell phone to call Chong and Gary, whose phone pinged the cell tower close to Lo's house.

On October 7, Chu bought a black 2000 Chevy Blazer from Alberto Alvarez for between $2,000 and $2,500. He paid for the SUV with cash and used the name "James

12

Saehorn" when filling out the release of liability form. Alvarez testified he received at least two phone calls that day from a man who wanted to look at the vehicle. Two Asian men showed up at the time and place agreed upon. One of the men was Lang. However, the other man did the bargaining, paid for the Blazer with cash, and filled out the paperwork, while Lang was mostly quiet. While Alvarez could not identify Chu as the person who bought the SUV, phone records indicate Chu was the one who made the calls to Alvarez about looking at the vehicle. Also on October 7, two prepaid cell phones were purchased. One was subsequently used by Lang, while the other was subsequently used by Chong and Gary. On two occasions that night, the new prepaid cell phone being used by Chong and Gary pinged the cell tower close to Lo's house.

On October 8, during the morning, Chu withdrew $1,500 from his checking account and also accessed his safety deposit box. Twice that afternoon, about half an hour apart, Chu's prepaid cell phone connected to the new phone being used by Chong and Gary. This new phone pinged the cell tower close to Lang's house, while Chu's phone pinged the cell tower close to Lo's house. There is no indication anyone rented a motel room for Chong and Gary on this day. The following afternoon, Chu used his prepaid cell phone to again call Chong and Gary. This time, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. Later that night, during two calls made to different numbers, their phone again pinged the cell tower close to Lo's house. Two or three minutes after the second call, an SUV similar to the newly-purchased Blazer drove past Lo's house. Less than half an hour after that, their phone again pinged the same cell tower. Between October 10 and October 13, their phone pinged that same cell tower six more times. On two other occasions, the phones being used by Chong and Gary to communicate with their significant others also pinged this cell tower.

On October 14, the day before the murder, Chu withdrew $2,000 from his checking account. He worked that night at RCCC. His shift started at 7:00 p.m. and ended at 7:00 a.m. the following day. By the time Chu got off of work, Lo was dead.

13

Correctional officers working with Chu that night testified he was "on the phone a lot," about "five, six or seven times," having "[l]engthy" conversations in a language other than English, and using two separate cell phones. These accounts are corroborated by the phone records. Between the start of Chu's shift and midnight, his prepaid cell phone called the phone being used by Chong and Gary 10 times. Chu also used a separate cell phone, the one registered to his sister, to talk to his girlfriend for over 90 minutes.

### *The Murder*

Lo was murdered as he opened his garage door to leave for work a few minutes before 5:00 a.m. on October 15. His wife, who was studying in the family room at the time, heard "commotions" coming from the garage and ran to check on her husband. When she got to the garage, the garage door was "wide open" and her husband was lying on the ground with his head propped against one of the walls. He had been shot in the forehead. Afraid whoever shot her husband "might still be out there," Lo's wife closed the garage door. She then called 911 and pulled her husband flat on the garage floor to check for other injuries. Police officers and emergency medical personnel arrived a short time later. When they arrived, Lo had blood coming from his nose and pooled beneath his head. He was still breathing, but was unresponsive. Lo was later pronounced dead at University of California at Davis Medical Center.

A subsequent autopsy revealed the fatal gunshot wound had gunpowder stippling, indicating the gun had been fired from a range of several inches to a few feet from Lo's head. There was also a rectangular abrasion, which contained a laceration, on top of his head and defensive wounds on his right hand. The abrasion was consistent with Lo having been "pistol whipped" prior to the fatal shot being fired. A subsequent analysis of the crime scene revealed a second bullet had been fired that missed Lo and lodged in a cabinet in the garage. The bullets recovered from Lo's body and the cabinet were both "nominal 38 caliber" bullets, but each was fired from a separate gun. An expended 9-millimeter shell casing that could have contained either bullet was also recovered from the floor of the garage.

14

Returning to the activities of Chu and his brothers, about five hours before the murder, shortly after midnight, and less than half an hour after Chu's tenth phone call to the phone being used by Chong and Gary, an SUV similar to the black Blazer purchased by Chu eight days earlier drove past Lo's house. Chu again called Chong and Gary at 4:29 a.m., and again at 4:33 a.m. During each call, the phone being used by Chong and Gary pinged the cell tower close to Lang's house. At 4:46 a.m., there was another drive-by of Lo's house by an SUV similar to the black Blazer purchased by Chu. Between 4:46 a.m. and 5:18 a.m., Chu used his registered cell phone to call Chia's cell phone seven times. Lo was murdered during this barrage of calls.

### *The Aftermath*

About half an hour after the murder, Chu again used his prepaid cell phone to call Chong and Gary. The phone being used by Chong and Gary again pinged the cell tower close to Lang's house. Chu left work shortly after this call was made. Less than two hours later, Chu used his prepaid cell phone to call Chong and Gary three more times. Their phone was still pinging the cell tower close to Lang's house. About two hours later, Allyssa terminated service for the cell phone Chu had been using primarily to call his girlfriend. About an hour after that, Chu accessed his safety deposit box and then made another call to Chong and Gary. Their phone was now pinging cell towers in the Corning area. This was the last phone call made with Chu's prepaid cell phone. Later in the afternoon, having stayed in the Corning area for at least two and a half hours, the prepaid phone being used by Chong and Gary again pinged the cell tower close to Lang's house. At some point during the day of the murder, Chu also booked a one-way flight from Minneapolis to Sacramento for November 4.

The following day, October 16, Lang again rented a room at one of the Motel 6 locations previously used as a base of surveillance operations. The room was rented for two nights and paid with cash. The vehicle associated with the room rental had the same license plate number as the Blazer purchased by Chu. Between October 19 and 20, Chong and Gary drove the Blazer from Sacramento to Minnesota. Their cell phones

15

tracked their movement, pinging cell towers in Utah and Iowa along Interstate Highway 80 before pinging a cell tower in the Minneapolis area on the evening of October 20. When they returned to Minnesota, Chong and Gary met their significant others, Neng and Kalue, at a park in St. Paul. They arrived in the same Blazer they drove across the country. Gary was in possession of about $3,000 in cash. Chong was also in possession of a "stack" of cash. Thereafter, Neng and Kalue purchased new prepaid cell phones for their communications with Chong and Gary and threw their old phones away. Chong and Gary spent eight or nine days in a motel room rented by Kalue with money given to her by Gary. After that, they moved into an apartment in St. Paul, along with Kalue and her daughter, which Neng and her two children also visited. Kalue again secured the accommodations with money given to her by Gary. At Chong's request, Neng facilitated transfer of the Blazer to Pag Moua, to whom she was secretly engaged.

In March 2009, the apartment where Chong and Gary were living was raided by Minnesota law enforcement officers and FBI agents. Chong and Gary were arrested. During a search of the apartment, officers found a black backpack containing a Taser, two black stocking caps, two pairs of black gloves, a flathead screwdriver, and a jar of black camouflage makeup. The following day, police recovered the Blazer previously transferred to Moua. Chu was arrested in Sacramento later the same month. Various searches conducted in California uncovered evidence connecting Chu to the aforementioned efforts to discover Lo's identity and surveillance activities. Fingerprints at the Corning property also confirmed Chong and Gary had been at that location.

### Gary's Pretrial Statement to Kalue Regarding the Murder

The following testimony was heard by Gary's jury only. At some point while living at the St. Paul apartment, Kalue began to suspect Gary's arrival in Minnesota was connected to Lo's murder and asked him whether he killed Lo. Gary initially denied involvement. Later in the same conversation, he admitted he and Chong killed Lo at Chu's request. As Kalue explained: "He told me the morning of the murder, both himself and Chong were both in the black Blazer waiting outside Steve Lo's home

16

waiting for him to come to work. Saw him out from his garage to his door. They got out from the car, chased him down in the garage. I'm not sure who pistol whipped him, but one of them did that to Steve Lo and then shot him and then took off." Gary explained to Kalue that Chu asked him to kill Lo because "Chu's wife was having an affair with Steve Lo" and also told Lo that Chong and Gary were "fugitive[s] from Minnesota." Gary further stated they "threw their guns over a bridge" after the murder; Chu then gave Gary "some money" before he and Chong left California for Minnesota.

## DISCUSSION

We first address contentions raised by Chong and Gary in appeal No. C069517. We then turn to the sole claim of error asserted by Chu in appeal No. C066885. None have merit.

### APPEAL NO. C069517 (CHONG AND GARY)

#### I

#### *Admission of Evidence of the Minnesota Murder*

Chong and Gary contend the trial court prejudicially erred and violated their respective constitutional rights to a fair trial by admitting evidence of the Minnesota murder and their appearance in an episode of *America's Most Wanted*. We disagree.

#### A.

#### *Additional Background*

Chong moved in limine to exclude evidence he was wanted for the Minnesota murder and was mentioned on *America's Most Wanted*, arguing, "presentation of these facts will unduly prejudice the jury because the crime is so similar in nature" and "will confuse the jury and provide an avenue for them to not review and consider the facts in the case at hand, but to think about the Minnesota allegations instead, and consider them when trying to determine whether [Chong] had any role in the murder of Steve Lo." Chong continued: "The jury will improperly follow human instinct to prejudge the facts because of the warrant in Minnesota and the alleged manhunt which was ongoing at the time of the murder of Steve Lo. It provides the perfect avenue for the jury to be

17

prejudiced, and the effect of that prejudice will result in the conclusion that if he was wanted for murder at the time of this homicide, he must have had something to do with it because he has done it before. This evidence and information must be excluded or the jury will wrongfully convict [Chong] who would not be afforded a fair trial."

During argument on the motion, the prosecutor argued, "the fact that [Chong] had charges outstanding" and "was a fugitive from justice" was relevant and admissible to establish Chong's motive to participate in the murder. The prosecutor explained: "We have to, from the People's perspective, explain why it is that [Chong] was involved in this murder. [¶] The People's perspective [is that] it is in part because the person who is asking him to do it is his brother, his oldest brother, [Chu[9]]. But that is insufficient motive, I think, for most people to grasp or understand. [¶] I think most people if they were approached by a sibling and asked to commit a murder, most people would say no, regardless of the circumstances. They would not find that sufficient to understand why somebody would go to the degree that these two people did. [¶] What's far easier to understand is that not only do we have the familial relationship between these people and [Chu], but that [Chu] had actively assisted them in escaping justice for a period of over two years as of the time of this particular offense. He had actively helped them to escape from Minnesota and also from Sacramento and had provided them with a place to stay for some period of time. [¶] The jury needs to understand that in order to understand why it is that [Chu] felt as of the time of this offense that he could approach these two and ask them to commit a murder. [¶] It's not just that they are relatives. It

---

**9** The reporter's transcript indicates the prosecutor said, "Chong," rather than "Chu." This was either a misstatement by the prosecutor or a typographical error by the reporter. Because later references in the prosecutor's argument are to "Chu," we conclude there to be no doubt the prosecutor either said or meant to say "Chu." Thereafter, in the trial court's ruling on the motion, the reporter's transcript indicates the trial court occasionally referred to Chu as "Khou." Because we conclude there to be no doubt those references were also either misstatements or typographical errors, we correct those erroneous references as well.

18

is that he had stuck his neck out for them. He was a sheriff's deputy at the time; this is a man who had everything to lose by assisting his fugitive brothers. He did so, and therefore these defendants in this trial owed him a great deal." The prosecutor continued: "To be blunt, the fact that these people were fugitives and what they were fugitives for is inextricably intertwined with the facts underlying the murder in this particular case. [¶] I see no way that you could extricate those matters without extreme prejudice to the People and without confounding and confusing the triers of fact when they are trying to figure out what was done, why it was done and who did it. All of those things are very relevant."

In response, Chong's trial counsel argued the probative value of evidence Chong was wanted for murder in Minnesota, mentioned in the *America's Most Wanted* episode, and helped by Chu to remain hidden "is quite low" because "the only issue [in the case] is who did the killing," and to allow such evidence to prove "that Chu is helping them and that [the murder] is some payback to Chu . . . would be far too prejudicial." Chong's counsel also pointed out motive is not an element of murder and concluded: "I think when we balance it, we see that allowing that in to just show motive will actually, . . . it is far too heavy, and that the prejudicial effect will allow the jury to make presumptions, to jump to conclusions, and they won't be limited by the instructions not to do so because human nature tells them to do so." Gary's trial counsel then joined in the foregoing argument, adding: "It's clearly . . . character assassination. It's allowing prejudicial bad character that would normally not be admitted against [a defendant] unless he were to take the stand."

In rebuttal, with respect to balancing probative value against the danger of undue prejudice, the prosecutor argued: "I understand the significance of the fact that these people were running from a murder charge as of the time of this offense. That clearly has got a prejudicial effect. But in order to understand the gravity of the relationship between them and [Chu], you have to know this fact. [¶] It's not as if they're fleeing from a DUI. They're fleeing from a murder. [Chu] has got a significant hold over these people, a

significant tie over these people as of the time that he goes over to them and makes this request to them on his behalf.  The jurors have to understand that to understand correctly the whole factual scenario of this case."

The trial court took the matter under submission and thereafter ruled:  "The Court is persuaded that the fact that -- assuming the People can prove it, they have a right to put on evidence . . . that the motive for agreeing to [Chu]'s request that Steve Lo be killed, in the People's theory of the case, is that your client, [Chong] and also co-defendant [Gary], were being maintained at considerable expense financially and risk and expense ultimately to [Chu's] career in that he had -- knowing that they were wanted by Minnesota, he bought property in Corning, in Tehama County, had a mobile home moved on to that property in which to hide both defendants during an extended period of time, that he also at different times in connection with both the purpose of hiding them, as well as to -- as well as, apparently, to facilitate the arrangements for the murder of Steve Lo hid them by moving them from motel to motel and from car to car and the like.  [¶]  And, consequently, when he requested that they kill Steve Lo they had a motive to do so.  They felt an obligation to him since he had gone so far out on the limb in terms of personal expenditures and risk to career and his own liberty by committing crimes to hide them and so forth, that that's directly relevant to the People's legitimate interest and desire in presenting evidence as to their motive to exclude that, to not permit the People to bring that in would hobble them unduly and complicate unfairly their case, would leave a significant body of evidence that would be very helpful for the jury to understand motive sequestered and denied to the jury."  With respect to Evidence Code section 352, the trial court found the evidence to be "not unduly prejudicial" and "that to deny the People the right to put on that plainly relevant and germane evidence would work an extreme unfairness on the prosecution's case."  For the same reasons, the trial court also allowed the prosecution to present evidence of the *America's Most Wanted* episode, explaining, "the fact that it was widely known that [Chong and Gary] were wanted . . . made it all the more important to keep them carefully hidden and it also increased significantly the risk

20

to [Chu] and, therefore, the obligation . . . if they felt it to perform the execution that he requested of them was greater than the consequences."

Chu's trial counsel then requested the evidence "be sanitized by saying that they were -- had a fugitive warrant out for them that was issued from Minnesota." The trial court responded: "No. I am saying that it makes a difference that it's a murder warrant as opposed to grand theft auto warrant or something like that. [¶] The significance, the visibility of and risk that [Chu] was put to turned significantly on the nature of the offense for which they were wanted. And obligation in turn that the defendants in this case may have felt. [¶] Again, the People's theory of the case is significantly greater that they're be[ing] kept off the radar at great expense, both financial and in terms of risking [Chu's] liberty and career and all the rest, that they're wanted for murder; he being a law enforcement officer. [¶] So that will come in. The fact that this is -- that they're wanted for murder and the fact that it is widely publicized by -- among other things *America's Most Wanted*, both of those are relevant and to try to sanitize it in a fashion along the lines that you're requesting, does more than just sanitize it. It substantially guts the substance of that evidence."

Over Gary's objection, the trial court further ruled his statement regarding the Minnesota murder was admissible, in the case presented to his jury only, as "helpful to the jury in terms of filling in the connections, the interstices of the facts in evidence relating to the background for the motive, why [Gary] felt obligated, if he did, based upon the People's theory, to honor [Chu's] request that he kill Steve Lo." With respect to Evidence Code section 352, the trial court found Gary's statement to be "only marginally different that the mere fact that [he was] wanted for this Minnesota [murder]."

### B.

### *Analysis*

Joining in each other's arguments on appeal, Chong and Gary argue: (1) evidence of the Minnesota murder, including their appearance on *America's Most Wanted*, was inadmissible propensity evidence under Evidence Code section 1101 because the prior

21

murder was not relevant to prove they had a motive to commit the present murder and not similar enough to the present murder to allow admission of this evidence to prove their identities as the perpetrators of the present murder; (2) assuming the challenged evidence was otherwise admissible, it was unduly prejudicial and should have been excluded under Evidence Code section 352; and (3) admission of the challenged evidence violated their constitutional rights to due process and a fair trial. We address and reject each argument in turn.

### 1. *Evidence Code Section 1101*

With certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) One such exception is found in subdivision (b) of this section, which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . .) other than his or her disposition to commit such an act." (*Id*., subd. (b).) We review the trial court's admission of other crimes evidence for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25.)

Here, the challenged evidence was admitted to prove motive on the part of Chong and Gary to agree to act as Chu's assassins. While motive is not an element of murder, "'the absence of apparent motive may make proof of the essential elements less persuasive.'" (*People v. Davis* (2009) 46 Cal.4th 539, 604, quoting *People v. Phillips* (1981) 122 Cal.App.3d 69, 84.) Moreover, in a case such as this one, "'where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, . . . evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly material.'" (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 896, quoting *People v. Argentos* (1909) 156 Cal. 720, 726.) Evidence Chong and Gary were wanted in connection with a murder in Minnesota, fled to

California, and were hidden by Chu at considerable expense and notwithstanding significant danger to both his liberty and career as a law enforcement officer, tended "logically, naturally, and by reasonable inference to prove [their] motive" (*People v. Daniels* (1991) 52 Cal.3d 815, 856) to participate in Chu's plot to murder Lo. Evidence they were featured in an episode of *America's Most Wanted* served to highlight the risk Chu was taking in hiding his fugitive brothers. During the episode, a picture of Gary was displayed while the narrator stated: "Cops in Minnesota say Gary Vue murdered a man. Gary Vue may be hiding with his brother Chong." Anyone who saw this episode and thereafter saw Chong and Gary together could have recognized Gary, assumed the man with him was Chong, and reported their location to law enforcement. The *America's Most Wanted* episode also explains why Chu, two months after the episode aired during prime time television viewing hours in California, began looking for a more secluded hideout for Chong and Gary, ultimately securing the Corning property and expending a considerable amount of money to make that property habitable. All of this evidence went to establish motive. In other words, the fact Chu went to these lengths to protect Chong and Gary from the consequences of the Minnesota murder tends in reason to make it more likely they would have returned the favor by agreeing to murder Lo on his behalf. Indeed, without this evidence, their only apparent motive for participating in the murder would have been the fact Chu was their older brother. This would have given the jury a misleading picture of the case. For these reasons, the challenged evidence was admissible under Evidence Code section 1101, subdivision (b), to prove motive.

Nevertheless, Chong and Gary argue that because "[t]he issue in this case was identity, . . . the greatest degree of similarity between the charged offense and the uncharged offense must exist." Not so. We have already explained the challenged evidence was relevant to establish motive. "Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017-1018.) However, whereas "[t]he relevance of uncharged misconduct to show identity,

23

intent, or the existence of a common design or plan is determined by the nature and degree of the similarity between such misconduct and the charged crime[,] . . . [¶] . . . 'the intermediate fact of motive' may be established by evidence of 'prior dissimilar crimes.' [Citation.] 'Similarity of offenses [is] not necessary to establish this theory of relevance' for the evident reason that the motive for the charged crime arises simply from the commission of the prior offense. [Citation.] The existence of a motive requires a nexus between the prior crime and the current one, but such linkage is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes. [Citations.]" (*Id*. at p. 1018.) Here, the requisite nexus is supplied by the fact Chu protected Chong and Gary from the consequences of the prior offense, at considerable expense and risk, which tended in reason to make it more likely Chong and Gary would have acceded to Chu's request that they carry out a murder on his behalf. No more is required to render the evidence admissible under Evidence Code Section 1101, subdivision (b).

## 2. *Evidence Code Section 352*

The foregoing conclusion, however, does not end our inquiry. Evidence Code section 352 provides for the exclusion of otherwise admissible evidence if its probative value is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." With respect to other crimes evidence, our Supreme Court has explained: "Even if evidence of other crimes is relevant under a theory of admissibility that does not rely on proving disposition, it can be highly prejudicial. 'Regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice. . . .' [Citation.] Therefore, the law places other restrictions on its admissibility." (*People v. Thompson* (1980) 27 Cal.3d 303, 318.) To be admissible under Evidence Code section 352, the evidence "must have substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123.)

The trial court did not abuse its discretion in admitting the challenged evidence under Evidence Code section 352. "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.'" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550, quoting *People v. Lopez* (1969) 1 Cal.App.3d 78, 85; see also *People v. Kovacich*, *supra*, 201 Cal.App.4th at p. 896.) Such is the case here. There is a substantial difference between brothers who are alleged to have carried out a murder on another brother's behalf out of feelings of brotherhood and those who have the added incentive of paying the latter brother back for years of keeping them hidden from law enforcement after they fled from another state to escape murder charges. Moreover, this "substantial probative value . . . is not *greatly outweighed* by the potential that *undue prejudice* [would] result from admitting the evidence." (*People v. Lenart*, *supra*, 32 Cal.4th at p. 1123, italics added.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Here, the damage caused by admission of the challenged evidence "was only that which naturally flowed from relevant, highly probative evidence." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 317.)

Nevertheless, Chong and Gary assert there was no need to present the details of the Minnesota murder. Chong's briefing argues: "On the issue of motive, all the jury needed to know (1) was [Chong and Gary] were fugitives on a Minnesota warrant and (2) [Chu] went to a lot of time and trouble and money to hide them." Gary's briefing makes the same basic point, but acknowledges the jury might also have needed to know the

Minnesota crime was "serious." We are not persuaded. First, we agree with the trial court that the risk undertaken by Chu to protect his brothers from the consequences of *a murder* is qualitatively different from the risk associated with protecting them from the consequences of some unidentified crime. Even if the jury was informed the prior crime was serious, murder is "one of the *most serious* offenses, even when special circumstances are not alleged." (*Williams v. Superior Court* (1983) 34 Cal.3d 584, 593, italics added.) We conclude the fact the prior crime was murder, as opposed to possession of a controlled substance or even robbery, tended in reason to make it more likely—and substantially so—that Chong and Gary would have felt obligated to repay their brother's risk-laden protection by participating in his plot to murder Lo.

Second, the details of the Minnesota murder also had substantial probative value because they corroborated statements made by Chong and Gary concerning this murder, making it more likely they actually committed the prior crime. As the jury was properly instructed, the jury could consider evidence of the prior murder "only if the People . . . proved by a preponderance of the evidence that [Chong and Gary] in fact committed the murder in Minnesota." Moreover, these details were provided to the jury by a single witness, the Minnesota police officer who arrived at the scene of the drive-by shooting, and one short stipulation. The officer described the victim as having a gunshot wound to the forehead and blood on his shirt, and also described the victim's vehicle as having multiple bullet holes. The stipulation informed the jury of the victim's injuries, i.e., one gunshot wound to the forehead and another to the chest, while a third bullet grazed his thigh. Neither the officer's testimony nor the stipulation was unduly prejudicial within the meaning of Evidence Code section 352.

### 3. *Due Process*

We further reject Chong and Gary's argument that admission of the challenged evidence violated their federal constitutional right to due process and a fair trial. Our Supreme Court has "long observed that '[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.'

26

[Citation.]" (*People v. Lindberg*, *supra*, 45 Cal.4th at p. 26.) Chong and Gary do not persuade us this case presents an exception to this general rule.

Nor are we persuaded by their reliance on *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073 (*Bean*) and *Panzavecchia v. Wainwright* (5th Cir. 1981) 658 F.2d 337 (*Panzavecchia*). Both cases involved the joinder of charges that resulted in a violation of due process. In *Bean*, the Court of Appeals for the Ninth Circuit held there to be a due process violation where a "relatively weak" case against the defendant involving crimes committed against one victim was joined with a "compelling" case involving the same crimes committed against another victim, and the jury was not instructed that it could not consider evidence of the stronger case as evidence establishing the weaker case. (*Bean*, *supra*, 163 F.3d at pp. 1083-1085.) In *Panzavecchia*, the Court of Appeals for the Fifth Circuit held there to be a due process violation where the trial court denied a motion to sever a murder count from a count charging possession of a firearm by a convicted felon, and where evidence of the defendant's prior conviction (which was relevant to the firearm possession count, but not to the murder count) was admitted without the jury being instructed to consider this evidence only in connection with the firearm possession count. (*Panzavecchia*, *supra*, 658 F.2d at pp. 340-342.) Unlike *Bean* and *Panzavecchia*, where evidence of criminal conduct that was inadmissible to establish one or more counts was admitted without a proper limiting instruction, here, evidence of the Minnesota murder was relevant to establish motive on the part of Chong and Gary to act as Chu's assassins. Moreover, here, the respective juries were specifically instructed that the challenged evidence was admitted "for the limited purpose of deciding whether or not . . . [Chong and Gary] had a motive to commit the [murder]," and further admonished: "Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that [Chong or Gary] has a bad character or is disposed to commit crime." There was no due process violation.

In sum, evidence Chong and Gary were wanted in connection with the 2001 Minnesota murder that was publicized during prime time television viewing hours in

27

California in 2006, as well as the fact Chu went to great lengths to hide them from those seeking to effect their arrest, was properly admitted under Evidence Code section 1101, subdivision (b), as relevant to prove motive on the part of Chong and Gary to act as Chu's assassins in the plot to murder Lo. This evidence was not unduly prejudicial under Evidence Code section 352. Nor did the admission of this evidence violate their federal constitutional right to a fair trial.

## II

### *Instruction on Consciousness of Guilt*

Chong and Gary also claim the trial court prejudicially erred and violated their constitutional rights by instructing the jury with CALCRIM No. 362 on consciousness of guilt without adequate evidentiary support. Chong objected to this instruction; Gary did not. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927 (*Anderson*); *People v. Battle* (2011) 198 Cal.App.4th 50, 64-65.) With respect to Chong, we conclude the instruction was adequately supported by the evidence; therefore, the trial court did not err in providing it to his jury. With respect to Gary, assuming it was error to provide this instruction to his jury, any error was manifestly harmless; therefore, Gary's failure to object to the instruction forfeits the contention.

### A.

### *Additional Background*

The following evidence was presented to Chong's jury only. The day after Chong's arrest, he was interviewed in Minnesota by detectives from the Sacramento Police Department. When asked how long he had been in Minnesota, Chong answered: "About two years." After a few more questions regarding where Chong was originally from, Chong stated: "You guys got all that information already." Then, after a brief argument concerning how much information the detectives already knew about Chong,

28

one of the detectives asked whether he had "been out to Sacramento in the last year." Chong answered: "No." Chong was then asked when was the last time he had been in California. He answered: "Three years ago, I think." One of the detectives followed up: "So 2006 you were in California?" Chong responded: "Yeah. When I took off." When asked how long he stayed in California in 2006, Chong answered: "For what, six months." The other detective then asked: "You left California and you haven't been back there since?" Chong answered: "Nuh-uh. I haven't been back there." At this point, one of the detectives admitted: "You're -- you're right about some certain things. I know a whole lot more shit that I'm --" Chong interrupted: "I know." The detective finished: "-- than I'm letting on." The other detective added: "Yeah. We made a journey out here for a reason." The detectives then confronted Chong with the fact his fingerprints were found in the mobile home that was moved onto on the Corning property "sometime last year." Chong denied they were his fingerprints.

## B.

### *Analysis*

"It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102, citing *People v. Showers* (1968) 68 Cal.2d 639, 643.) However, the false statement must be deliberately false, concern matters within the defendant's knowledge, and relate to the charged crime. (*People v. Kimble* (1988) 44 Cal.3d 480, 496; see also *People v. Fritz* (2007) 153 Cal.App.4th 949, 957 [providing examples of "a false alibi, a questionable story about how defendant came to innocently possess stolen goods, or a denial of any relationship to the victim"].)

In accordance with these established principles, the respective juries were instructed with CALCRIM No. 362 as follows: "If the defendant made a false or misleading statement before his trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the

29

defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

With respect to Chong, the day after his arrest in Minnesota, he was interviewed by Sacramento detectives concerning the last time he was in California. Chong lied and said he had not been out to California since 2006. In his briefing on appeal, Chong argues this lie was not related to the murder of Lo because the detectives did not directly accuse Chong of that murder at the time he lied about being in California. We are not persuaded. Based on the fact Chong was being interviewed by *Sacramento detectives*, who flew to Minnesota to interview Chong the day after his arrest, the jury could have reasonably inferred Chong was aware they were there to question him about Lo's murder, and not, as Chong argues on appeal, about his having hidden from the Minnesota warrant in California. And while the record does not reveal whether the detectives identified themselves as Sacramento detectives prior to the interview, or whether they were wearing distinctive Sacramento Police Department uniforms, the jury could have inferred Chong suspected as much from the fact they initially asked him whether he had "been out to Sacramento in the last year," and informed him, "We made a journey out here for a reason," after which Chong repeated his lie that he had not recently been to California. The detectives then confronted Chong with his fingerprints at the Corning property, which he claimed were not his prints. Another lie. We conclude the jury could have reasonably inferred both lies related to the murder of Lo and therefore evidenced Chong's consciousness of guilt. The trial court did not err in providing this instruction to Chong's jury.

Obviously, the foregoing evidence does not support giving the same instruction to Gary's jury. However, because Gary did not object to this instruction, there was no discussion in the trial court as to whether the instruction was supported by a false statement he made relating to the murder. We need not determine whether Gary made such a statement because the issue is forfeited unless the claimed error resulted in a

30

miscarriage of justice. (*Anderson*, *supra*, 152 Cal.App.4th at p. 927.) Assuming the challenged instruction was not supported by evidence adduced before Gary's jury, the error was manifestly harmless. While it is error to give a legally correct instruction "which has no application to the facts of the case," such an error is usually harmless, having little or no effect "other than to add to the bulk of the charge." (*People v. Sanchez* (1947) 30 Cal.2d 560, 572-573.) Such is the case here. Indeed, CALCRIM No. 362 specifically admonishes the jury: *"If you conclude that the defendant made the statement*, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (Italics added.) The jury was also instructed, in CALCRIM No. 200: *"Some of these instructions may not apply*, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts." (Italics added.) We presume the jury understood and followed these instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Thus, assuming there was no evidence of a false statement made by Gary related to the murder, we must presume the jury concluded he made no such statement and therefore did not draw the inference permitted by CALCRIM No. 362, i.e., that he was conscious of his guilt.

Moreover, the evidence proving Gary's guilt was very strong. Chu had a strong motive to murder Lo. Gary had a strong motive to help his brother do so. And in addition to the multitude of circumstantial evidence in this case—among other things, the elaborate surveillance activities undertaken by Chu, Gary and Chong, using multiple motel rooms as bases of operation, multiple vehicles to drive past Lo's house, and multiple prepaid cell phones to communicate during their operations—Gary confessed to having murdered Lo at Chu's request. Accordingly, we conclude any purported error in providing CALCRIM No. 362 to Gary's jury did not result in a miscarriage of justice and the issue is therefore forfeited.

31

# III

## *Instruction on Vicarious Criminal Liability Based on Conspiracy*

Chong and Gary further assert the trial court prejudicially erred and violated their constitutional rights by instructing the jury with CALCRIM Nos. 416 through 420 on vicarious criminal liability based on conspiracy. Neither Chong nor Gary objected to these instructions in the trial court. Accordingly, as we have already explained, the issue is forfeited unless the claimed error resulted in a miscarriage of justice. (*Anderson*, *supra*, 152 Cal.App.4th at p. 927.) There was no error, much less a miscarriage of justice.

Chong and Gary argue the challenged instructions were erroneous because "uncharged conspiracy is not a valid theory of vicarious criminal liability in California as a matter of law." This argument is based on the fact "section 31 defines two distinct groups of perpetrators who are liable for commission of a crime[,] direct perpetrators and aiders and abettors," but does "not state that people who conspire to commit a crime are principals." According to Chong and Gary, our Supreme Court erred in *People v. Kauffman* (1907) 152 Cal. 331, when it "recognized conspiracy as a theory of vicarious criminal liability based upon a treatise and without citing or discussing section 31," and "the error has persisted" ever since, citing the following decisions from our Supreme Court that either suggest or squarely hold conspirators are liable as principals under section 31: *People v. Creeks* (1915) 170 Cal. 368, 374-375; *People v. Bringhurst* (1923) 192 Cal. 748, 751; *People v. Harper* (1945) 25 Cal.2d 862, 871-873; *People v. Pike* (1962) 58 Cal.2d 70, 88-89; *People v. Teale* (1965) 63 Cal.2d 178, 188, revd. on other grounds, sub. nom. *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]; *People v. Hardy* (1992) 2 Cal.4th 86, 188-189; *People v. Prieto* (2003) 30 Cal.4th 226, 249-250; *In re Hardy* (2007) 41 Cal.4th 977, 1026.

While Chong and Gary present an interesting argument based on the statutory language of section 31, the foregoing authorities compel its rejection. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) And to the foregoing list,

32

we add one more, *People v. Valdez* (2012) 55 Cal.4th 82, in which our Supreme Court expressly rejected the argument that "the trial court erred in allowing the prosecution to proceed on an uncharged conspiracy because, under the statutory definition of principal (§ 31), 'participation in a conspiracy alone is not an authorized basis for finding a person guilty of any offense other than conspiracy,'" explaining: "Our decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; *nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory* [citations]." [Citation.]' [Citations.] Defendant acknowledges our prior decisions, but invites us to reexamine them. However, he offers no persuasive basis for doing so, and we decline his invitation." (*Id.* at pp. 149-150, italics added.)

The trial court did not err in instructing the respective juries on vicarious criminal liability based on conspiracy.

## IV

### *Instruction on Assessment of Witness Credibility*

We also reject the argument that the trial court prejudicially erred and violated Chong and Gary's constitutional rights by instructing the jury, pursuant to CALCRIM No. 316, that it "may consider" a finding that a witness has engaged in prior criminal conduct in assessing that witness's credibility, rather than instructing the jury it "must consider" such a finding. We previously rejected this argument in *Anderson*, *supra*, 152 Cal.App.4th at pages 940-941.

33

## V

### *Cumulative Prejudice*

Having rejected each contention raised by Chong and Gary in their appeal, we must also reject their additional claim that the cumulative prejudice flowing from these assertions of error requires reversal.

APPEAL NO. C066885 (CHU)

## VI

### *Order Requiring Chu to be Physically Restrained During Trial*

Finally, Chu contends the trial court abused its discretion and violated his federal constitutional rights by ordering him restrained in belly chains through most of the trial and requiring him to be chained to the witness stand while testifying without a showing of manifest need for such restraint. We conclude the decision to restrain Chu, while an abuse of discretion, did not amount to a violation of his federal constitutional rights and was harmless.

### A.

### *Additional Background*

Most of the evidence adduced during the joint trial of Chong and Gary was also adduced during Chu's trial. However, in Chu's trial, many facts were not disputed. For example, Chu did not dispute using various means, including making unlawful use of sheriff's department computers, to learn Lo's identity and address after discovering the affair. Chu also did not dispute protecting his fugitive brothers from the consequences of the prior Minnesota murder by, among other things, establishing their hideout in Corning. Nor did Chu dispute that Chong and Gary murdered Lo as he opened his garage door to leave for work on the morning of October 15, 2008. The primary issue at Chu's trial was whether he engaged them to do so, or whether they decided to murder Lo on their own, either because they saw Chia's infidelity as an insult to the entire family or because they feared Chia told Lo about their fugitive status. Chu's testimony at trial supported this latter theory.

34

With respect to the issue raised on appeal, prior to voir dire, Chu's trial counsel objected to Chu being restrained in belly chains during trial. Counsel pointed out Chu was a former deputy sheriff, had no prior criminal record, and had no disciplinary problems while in custody. Counsel further argued Chu was an escort officer at one point, knew how to behave in court, and was behaving properly. In response, the bailiff used "that exact argument as a counter argument," explaining Chu's extensive knowledge of the courthouse, his "specialized cop knowledge," his muscular build, and the fact he was facing a life sentence, justified the use of restraints. The bailiff did, however, acknowledge Chu had "no write-ups in regards to violence, and he had no problems with officers except for being a little mouthy on occasion." The trial court ruled Chu would be released from his belly chains during voir dire, and the issue would be revisited prior to the taking of evidence.

Apparently, the issue was revisited off the record prior to the taking of evidence. However, the only indication in the record as to the content of the trial court's ruling is the following statement made by the trial court prior to Chu's testimony: "[Chu's counsel] has raised a concern about the fact that [Chu] is on the stand now, and because of the security requirements which previously the Court addressed in an out-of-the-presence hearing and I made a number of rulings relative to security and restraints when [Chu] was in the courtroom consistent with those rulings, [Chu] is unable to stand at the -- now the witness box. He's in the witness box presently, but when he's sworn he won't be able to stand. [¶] . . . [¶] There is a concern based upon the fact that [Chu] is healthy, able and strong and has a comprehensive knowledge of the floor plan and logistics of the courthouse, which is unusual for a defendant, that based upon those factors and others I concluded that it would be necessary and appropriate to have some restraints the level of which are represented now in [Chu] being chained at his seat in the witness box."

Chu's counsel then argued against Chu being so restrained during his testimony, explaining: "I believe the major reason that [Chu] is secured to the chair is because of

his prior employment with the sheriff's department.  [¶]  Had [Chu] not been employed with the sheriff's department -- I don't believe there are any write-ups, I don't believe he has been disruptive, he has no record -- I think he would have been in the same boat as [co-defendant Lang], so I don't want the jurors to think that he's disrespecting them." Counsel then stated he would have "no problem" with the jury being informed that "because of [Chu's] past employment, because of his situation being charged with murder that he's secured to that chair, specifically . . . because of his knowledge that he knows the jail system and the court system, and because of that it's routine for him to be secured to the chair."  Counsel continued:  "And I think that's the only reason.  I can't believe there is any other reason why he's chained to that chair other than . . . his knowledge and having worked at the Sacramento County Jail.  I think that's the truth."

The trial court responded:  "Well, [counsel], it's not at all unusual that a defendant in a homicide trial who is physically able and fit, as in particular as [Chu] is, would be chained if they take the stand.  [¶]  They're typically chained, as has been [Chu] at the counsel table and then when they take the stand, the same level of security is almost always maintained."

Chu's counsel then stated:  "I'm not objecting to it, your Honor.  [¶]  I'm only saying that they might notice the difference that [Lang] wasn't chained to a chair." Counsel then suggested "as a compromise" that the trial court inform the jury Chu was ordered to "remain seated during the swearing . . . to minimize the fact that he's not going to stand up when he is sworn in."  The trial court then reminded counsel other witnesses had been sworn outside the presence of the jury.  Counsel agreed with that compromise: "No, actually, I think you're right.  I forgot other witnesses were sworn outside the presence of the other jury, so go ahead and swear him in now and indicate he has been sworn."  Chu was then sworn outside the presence of the jury, after which the jury entered the courtroom and was so informed.

36

## B.

### *Analysis*

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 (*Duran*); see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his [or her] detention to answer the charge"].) "'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained.' [Citation.]" (*People v. Cox* (1991) 53 Cal.3d 618, 651, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"[T]he mere fact that the defendant is a prison inmate, standing alone, does not justify the use of physical restraints. '[T]he trial judge must make the decision to use physical restraints on a case-by-case basis. The court cannot adopt a general policy of imposing such restraints upon prison inmates charged with new offenses unless there is a showing of necessity on the record.' [Citation.] And the decision whether to shackle a defendant may not be delegated to security or law enforcement personnel; the trial court must make its own determination regarding restraints. [Citation.] 'Moreover, "[t]he showing of nonconforming behavior . . . must appear as a matter of record. . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion."' [Citation.] The burden is on the People to establish in the record the manifest need for the shackling." (*People v. Miller* (2009) 175 Cal.App.4th 1109, 1113-1114.)

Chu argues, "the record clearly fails to demonstrate any need to have [him] belly chained to his chair, either at counsel table and certainly not while on the witness stand" because "[h]e neither engaged in nor threatened to engage in any nonconforming conduct

at any time." Chu further asserts he was deprived of his federal constitutional right to due process because the restraint "prevent[ed] him from standing up and swearing to tell the truth in front of the jury." The Attorney General does not argue the shackling in this case was supported by the requisite showing of manifest need, but instead asserts: (1) the contention is forfeited because "counsel acquiesced to the court's procedure of shackling [Chu] while on the witness stand and swearing him in outside the presence of the jury"; and (2) because there is no evidence the jury saw the chains, Chu "has failed to demonstrate federal constitutional error," and any state law error in requiring the restraints was harmless under the standard of *People v. Watson*, *supra*, 46 Cal.2d 818. We accept the implied concession there was no showing of manifest need for the shackling and turn to the forfeiture and harmless error arguments.

### 1. *Forfeiture*

The Attorney General argues this case is similar to *People v. McWhorter* (2009) 47 Cal.4th 318 (*McWhorter*), in which the defense counsel requested the defendant be unshackled, but "thereafter acquiesced in the remedy selected by the trial court—removal of the visible waist chains—and made no further objection, thereby waiving any claim on appeal with respect to the absence of further inquiry into the manifest need for the concealed leg restraints." (*Id*. at p. 375.) Here, the Attorney General argues, Chu's shackling argument is forfeited because, as in *McWhorter*, he "initially objected to the use of belly chains, but then acquiesced to the trial court's procedure of shackling [him] at the witness stand during [his] testimony."

We partly agree. Beginning with our disagreement, unlike *McWhorter, supra,* 47 Cal.4th 318, where there was an objection to restraints, an offered compromise, and an acquiescence in that compromise, here, Chu's counsel objected to the use of restraints, and *received an adverse ruling*. Much later in the trial, when Chu took the witness stand, his counsel made a new objection to the specific fact Chu would not be able to stand while being sworn in, offered his own compromise (informing the jury Chu was restrained solely because of his law enforcement background and knowledge of the

38

courthouse), and then acquiesced in the trial court's alternative compromise (swearing Chu outside the presence of the jury). Because counsel objected to the use of restraints at any point during the trial, and received an adverse ruling in that regard, we cannot agree his subsequent acquiescence in the trial court's *swearing in compromise* forfeited the argument that *the shackling decision itself* was a prejudicial abuse of discretion. We do, however, agree Chu has forfeited the argument that his inability to stand up in front of the jury to be sworn violated his federal constitutional rights. With respect to that discrete argument, counsel's acquiescence forfeits the contention.[10]

### 2. *Harmless Error*

"The California Supreme Court has not ruled which harmless error standard applies when a court abuses its discretion and permits a defendant to be shackled in violation of *Duran*. Thus far, the question appears to turn on whether the jury is aware of the physical restraints. '[W]hen a trial court abuses its discretion in shackling a defendant, evidence establishing that the jury saw the restraints means that the error rises to the level of constitutional error to be tested under the *Chapman* test. (*Chapman v. California, supra,* 386 U.S. 18.) Thus, while a brief glimpse of defendant in shackles would not constitute prejudicial error [citations], the use of physical restraints in the courtroom without a prior showing of the manifest need for such restraints violates *Duran*. [Citation.] When such restraints are visible to the jury for a substantial length of time without meeting the *Duran* requirements, this trial court error may deprive

---

**10** Anticipating forfeiture, Chu argues his trial counsel's acquiescence in the trial court's swearing in compromise amounted to constitutionally deficient performance. However, we would also reject Chu's argument that unjustified restraints, even when not visible to the jury, violates federal due process principles where the restraints prevented him from being sworn in while standing in front of the jury. As we explain in the following section of this opinion, the question whether unjustified shackling violates due process turns on whether the jury was aware of the restraints. The trial court's swearing in compromise prevented the jury from learning of the restraints. Accordingly, the prejudicial effect of the unjustified shackling is to be tested under the *Watson* standard. (*People v. Watson, supra,* 46 Cal.2d 818.)

defendant of his [or her] due process right to a fair and impartial jury, and may affect the presumption of innocence. [Citation.] Accordingly, when such error occurs, it rises to the level of constitutional error.' [Citations.]" (*People v. Vance* (2006) 141 Cal.App.4th 1104, 1114-1115; see also *People v. Miller*, *supra*, 175 Cal.App.4th at p. 1115.) However, where the record does not demonstrate the jury saw the restraints, "the error is not constitutional error, and it should therefore be tested under the *Watson* test." (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1829.)

Here, there is no evidence the jury saw Chu's restraints. Accordingly, we must determine whether there is a reasonable probability the result would have been different but for the restraints. We conclude there is no such probability. Indeed, our Supreme Court has "consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584; *People v. Foster* (2010) 50 Cal.4th 1301, 1322; see also *People v. Anderson* (2001) 25 Cal.4th 543, 596.) Chu disagrees, relying on *People v. Mar* (2002) 28 Cal.4th 1201 (*Mar*), in which our Supreme Court held the use of a stun belt as a restraint was subject to the same "manifest need" standard as more traditional forms of restraint (*id*. at pp. 1215-1220), and also held the use of a stun belt in that case was not supported by such a need and resulted in prejudice to the defendant therein (*id*. at pp. 1222-1225). With respect to prejudice, the court explained that "the evidence was not totally one-sided," the defendant's testimony "was not absurd or inherently implausible," and the jury's resolution of the case "turned completely on the jury's evaluation of the credibility of the witnesses, an evaluation that depended in large part upon the demeanor of each witness on the witness stand." (*Id*. at p. 1224.) The court continued: "From the cold record before us, it is, of course, impossible to determine with any degree of precision what effect the presence of the stun belt had on the substance of defendant's testimony or on his demeanor on the witness stand. But defendant, in objecting to being required to testify while wearing the stun belt, clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript

40

confirms that defendant was nervous while testifying at trial. It is, of course, not unusual for a defendant, or any witness, to be nervous while testifying, but in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial." (*Ibid.*) The court then concluded, "the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying" compelled the conclusion that the trial court's error in requiring the belt was prejudicial under the *Watson* standard. (*Id.* at p. 1225.)

This case is not *Mar*. First, unlike *Mar, supra,* 28 Cal.4th 1201, a case in which the defendant was convicted of resisting a peace officer, and that turned entirely on the jury's assessment of the respective credibility of two competing witnesses, i.e., the defendant and the officer he allegedly resisted, here, there was strong circumstantial evidence connecting Chu to the murder admittedly committed by his brothers. Indeed, as previously mentioned, Chu did not dispute much of this evidence. He admitted using the sheriff's department computer system to discover Lo's identity and address after he discovered the affair. He admitted protecting Chong and Gary from the consequences of the prior Minnesota murder, including establishing their hideout in Corning. He admitted driving past Lo's house on multiple occasions during the month leading up to the murder, and further admitted using a prepaid cell phone to communicate with Chong, who was also using a prepaid cell phone, during this time. He also admitted calling Alvarez about the Blazer he was selling, although he claimed the vehicle was purchased by Chong and Gary for their trip back to Minnesota and denied giving them money to buy the SUV. Nor did Chu dispute Chong and Gary murdered Lo, or *they* engaged in the surveillance operations established by their phone records, motel records, rental car records, and the video surveillance footage obtained from Lo's neighbor. Chu's defense was based on his claim *he* was unaware his brothers were engaging in these activities or that they planned

41

to murder Lo. However, while Chu's self-serving testimony in this regard was not "inherently implausible" (*Mar, supra*, 28 Cal.4th at p. 1224), neither was it believable in light of the foregoing undisputed evidence and other strong circumstantial evidence Chu was at the center of the plot to murder his wife's lover.

Second, the prejudice analysis in *Mar* turned on the psychological effects *a stun belt*, which delivers a "debilitating electric shock when activated by a transmitter controlled by a court security officer," and which, "in a troubling number of instances . . . has activated accidentally" (*Mar, supra*, 28 Cal.4th at pp. 1204-1205), could have had on the testifying defendant. (*Id*. at pp. 1224-1225.) The court was careful to point out: "*Unlike shackles and manacles, which have been used for hundreds of years and whose operation is predictable and effects well known*, the stun belt is a relatively new device with unique attributes and whose use has not been without problems or controversy. In light of the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant's capacity to concentrate on the events of the trial, interfere with the defendant's ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury." (*Id*. at p. 1205, italics added.) This case does not involve the use of a stun belt. And while traditional restraints have also been described as "tend[ing] to confuse and embarrass [a defendant's] mental faculties" (*People v. Harrington* (1871) 42 Cal. 165, 168), as we have already observed, their use has routinely been held to be harmless where there is no evidence the jury saw them. (*People v. Foster, supra*, 50 Cal.4th at p. 1322; *People v. Tuilaepa, supra*, 4 Cal.4th at pp. 583-584.)

We conclude the trial court abused its discretion when it ordered Chu to be restrained during trial without a showing of manifest need. However, because there is no reasonable probability the result would have been different but for the restraints, we cannot reverse the judgment.

DISPOSITION

The judgments are affirmed.


                                                        /s/
                                        HOCH, J.


We concur:


          /s/
RAYE, P. J.


          /s/
ROBIE, J.